**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

KENYA SPLOND,

Petitioner,

v.

RONALD E. OLIVER,[1] et al.,

Respondents.

Case No. 2:23-cv-00451-GMN-BNW

**ORDER**

## Introduction

Petitioner Kenya Splond filed a counseled First Amended Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254. ECF No. 15. In 2016, a Nevada jury convicted Splond of possession of a stolen firearm and offenses related to thefts at three retail establishments in Las Vegas, Nevada. ECF No. 9-6. Splond was sentenced to an aggregate of 168 to 936 months of imprisonment. ECF No. 9-18. In the remaining grounds of his Petition, Splond alleges trial counsel provided ineffective assistance in violation of the Sixth and Fourteenth Amendments. ECF No. 15. For the reasons explained below, the Court denies the Petition and grants a Certificate of Appealability on Ground 2(A).

---

[1] According to the state corrections department's inmate locator page, Splond is incarcerated at Three Lakes Valley Conservation Camp. *See* NDOC Inmate Search. The department's website reflects Ronald E. Oliver is the current warden for that facility. *See* Three Lakes Valley Conservation Camp Facility | Nevada Department of Corrections. The Court will therefore kindly direct the Clerk of Court substitute Ronald E. Oliver for respondent Gabriela Najera, under, *inter alia,* Rule 25(d) of the Federal Rules of Civil Procedure.

## Background[2]

### A. Facts underlying the offenses

#### 1. Crickett Wireless

On January 22, 2014, Splond spent about 20 minutes inside a Cricket Wireless store, and once he and the store clerk were alone, asked to purchase a cell phone battery. ECF No. 9-1 at 27–31, 41. The clerk, Samuel Echeverria, "clearly saw" Splond and noticed Splond had "a lot of acne on his face." *Id.* at 42. After Echeverria retrieved the battery and began to register the sale, Splond pointed a black revolver at him and said, "[g]ive me all the money before I blow your brains out." *Id.* at 28–29, 35–36. Splond took the money and left the store. *Id.* The robbery was recorded on video surveillance. *Id.* at 33–38. A month after the robbery, Echeverria identified Splond's photograph as that of the robber. *Id.* at 30–31, 38–39. He was 100 percent certain Splond was the robber. *Id.* At trial, he failed to identify Splond in court because Splond wore glasses and had a different goatee and haircut than the man who robbed him. *Id.*

Alisa Williams worked at an establishment next to Cricket Wireless. *Id.* at 46–50. She claimed that, on the day of the robbery, she saw an African American man with "scars" on his face leave Cricket Wireless and jump into the backseat of a silver-colored vehicle driven by an African American female. *Id.* Williams agreed that in 2014 she told police the vehicle had tinted windows, but at trial, she did not recall whether the vehicle had tinted windows or whether she told that to the police. *Id.* at 48, 55–56. Williams failed to identify Splond in a photographic

[2]The Court summarizes the relevant state court record solely as background for consideration of the issues in this case. The Court makes no credibility or factual findings regarding the truth or falsity of evidence or statements of fact in the state court. No assertion of fact made in describing statements, testimony, or other evidence in the state court constitutes a finding by the Court. Failure to mention a specific piece of evidence or category of evidence does not signify the Court overlooked it in considering the issues.

lineup array. *Id.* at 49–53. Williams did not identify the female driver in a photographic array of women suspects. *Id.*

**2. Metro PCS**

On January 28, 2014, Splond shopped for cell phone plans and cell phones at a Metro PCS store. ECF No. 9-3 at 42–43, 46. The store clerk, Graciela Angles, retrieved a phone from the back. *Id.* at 46–47, 51, 55–56. Angles and Splond were the only ones in the store. *Id.* Angles rang up the sale at Splond's request and he then ordered her at gunpoint to give him the money in the cash register. *Id.* Splond took the money and the cellphone and left the store. *Id.* Video surveillance recorded the robbery. *Id.* at 52–57. A month later, Angles identified Splond in a photographic lineup array. *Id.* at 47–50, 155–56. She was 100 percent certain he was the man who robbed her. *Id.* At trial, she identified Splond as the robber. *Id.*

**3. Star Mart**

On February 2, 2014, Splond chose a pack of Wrigley's spearmint gum at a Star Mart store and walked to the cash register. ECF No. 9-1 at 58–59. The store clerk, Brittany Slathar, recognized Splond as a prior customer. *Id.* at 66. Splond and Slathar were the only individuals at the store. *Id.* Splond requested two packs of Newport 100 cigarettes. *Id.* Slathar retrieved the cigarettes from behind her and was registering the sale when Splond pointed a black revolver at her and demanded she give him all the money in the register. *Id.* at 59–60, 65–66. Slather told him she could not open the register and Splond repeatedly told her, "Give me the money. Give me the money. I'm gonna kill you. You're gonna die." *Id.* Splond eventually took the cigarettes and gum and left. *Id.* at 59–61. The robbery was caught on videotape. *Id.* at 64–72.

An officer who responded to the robbery call was aware that robbers sometimes have a partner who drives the getaway vehicle. ECF No. 9-3 at 12–13. The officer stopped a lone silver

vehicle (with tinted windows and collision damage) driven by a female in the vicinity of the Star Mart. *Id.* at 11–30. Splond was found in the backseat along with a stolen firearm. *Id.* Police found Wrigley's Spearmint gum and Newport 100 cigarettes in the front seat. *Id.* At a show-up at the vehicle stop, Slather instantly identified Splond as the man who robbed her at the Star Mart. ECF No. 9-1 at 61–63, 68. Slather also identified Splond at trial. *Id.*

**B. Procedural summary**

In 2016, a jury convicted Splond of (1) Conspiracy to Commit Robbery; (2) three counts of Burglary While in Possession of a Firearm; (3) three counts of Robbery with Use of a Deadly Weapon; and (4) Possession of Stolen Property. ECF No. 9-6. Splond was sentenced to an aggregate of 168 to 936 months of imprisonment. ECF No. 9-18. Judgment was originally entered on February 13, 2017, and affirmed on appeal. ECF No. 10-5.

Splond filed a state pro se post-conviction petition for a writ of habeas corpus and counseled supplemental petition. ECF Nos. 10-10; 10-13; 10-14; 10-21; 10-27; 10-28. The state court held an evidentiary hearing for the claim that trial counsel failed to convey the State's plea offer. ECF No. 10-34. The state court denied the petition. ECF No. 10-36. Splond appealed and the Nevada Court of Appeals affirmed in part and reversed in part and remanded the case for an evidentiary hearing on Splond's ineffective assistance of counsel claims concerning the conviction for Possession of Stolen Property (Count 4). ECF No. 10-50. In lieu of an evidentiary hearing, the prosecution dismissed Count 4. ECF No. 10-55 at 4. The state court entered amended judgments of conviction, but Splond did not appeal or seek state post-conviction relief based on the amended judgments. ECF Nos. 10-55 to 10-56.

Splond filed a counseled First Amended Petition for a Writ of Habeas Corpus. ECF No. 15. The Court dismissed Grounds 2(B) and 2(C) as untimely and Grounds 3(D), 3(E), and 3(F)

as not cognizable. ECF No. 24. Splond appealed and the Ninth Circuit Court of Appeals remanded for the limited purpose of granting or denying a certificate of appealability. ECF Nos. 25; 29. This Court denied a certificate of appealability and Splond voluntarily dismissed the appeal. ECF Nos. 30 to 32. The respondent filed an answer to the petition. ECF No. 37. Splond did not file a reply and the time to do so has expired. *See* ECF No. 3.

**Discussion**

**A. Antiterrorism and Effective Death Penalty Act (AEDPA)**

The AEDPA sets forth the standard of review generally applicable in habeas corpus cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is contrary to clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d)(1), "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000), and citing

*Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court's decision is an unreasonable application of clearly established Supreme Court precedent under 28 U.S.C. § 2254(d)(1), "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409–10) (internal citation omitted).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). A state court's factual findings are presumed correct unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The petitioner has the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011); *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004).

**B. Standards for Evaluating Ineffective Assistance of Counsel (IAC)**

A petitioner claiming IAC has the burden to demonstrate (1) the attorney made errors so serious that he or she was not functioning as the counsel guaranteed by the Sixth Amendment, and (2) the deficient performance prejudiced the defense. *See Williams*, 529 U.S. at 390–91 (citing *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984)).

To establish ineffectiveness, the defendant must show counsel's representation fell below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 687–88. The petitioner bears the burden to overcome the presumption that counsel's actions "might be considered sound

trial strategy." *See id.* at 689. To avoid the distorting effects of hindsight, review of an attorney's performance must be "highly deferential" and must adopt counsel's perspective at the time of the challenged conduct. *See id.* Federal review of a state court's decision on *Strickland's* performance prong is "doubly deferential." *See Cullen*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). A reviewing court must "take a 'highly deferential' look at counsel's performance . . . through the 'deferential lens of § 2254(d).'" *Id.* (internal citations omitted).

To establish prejudice for an IAC claim, a petitioner must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is "probability sufficient to undermine confidence in the outcome." *Id.* "The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112.

### C. Ground 2(A)—Failure to Convey Plea Offer

Splond alleges his counsel provided ineffective assistance in violation of the Sixth Amendment by failing to present him with the State's plea offer. ECF No. 15 at 2–5. Respondents contend Splond fails to satisfy his burden to show the Nevada Court of Appeals unreasonably applied clearly established federal law or based its decision on an unreasonable determination of the facts. ECF No. 37 at 8–11.

#### 1. Additional Governing Standards

The Sixth Amendment, made applicable to the States through the Fourteenth Amendment, provides that an accused has the right to effective assistance of counsel at all criminal prosecutions. *See Missouri v. Frye*, 566 U.S. 134, 138 (2012) (citing *Strickland*, 466 U.S. at 686). Claims of ineffective assistance of counsel in the plea bargain context are governed

by the two-part test set forth in *Strickland*. *See id.* (citing *Hill v. Lockhart*, 474 U.S. 52, 57 (1985)).

"[A]s a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." *Missouri*, 566 U.S. at 145. When defense counsel allows an offer to expire, without conveying that offer to the defendant, counsel is not rendering effective assistance of counsel. *See id.*

To show prejudice "where a plea offer has lapsed or been rejected because of counsel's deficient performance," the defendant must demonstrate the following: (1) "a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel," (2) "a reasonable probability the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it if they had the authority to exercise that discretion under state law," and (3) "a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time." *Id.* at 147; *see also Lafler v. Cooper*, 566 U.S. 156, 168 (2012) ("If a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it. If that right is denied, prejudice can be shown if loss of the plea opportunity led to a trial resulting in a conviction on more serious charges or the imposition of a more severe sentence.").

**2. Pretrial Plea Negotiations**

In March 2014, the State charged Splond in Case No. C-14-296374-1 with offenses related to the Star Mart store incident and possession of a stolen firearm. ECF No. 8-4. Frank Kocka was retained to represent Splond and Agnes Lexis was the prosecutor. ECF No. 8-6 at 3. At calendar call in early April of 2014, Kocka stated: "I'm trying to get together with the DA, get

an offer on the table. I think we're probably going to get this one resolved." ECF No. 8-8 at 3. At a calendar call in late April, Kocka stated "[t]here's an offer that's floating around out there, we just need to finalize it." ECF No. 8-9 at 3.

In June, Kocka informed the state court: "Your Honor, we have been going back and forth with Ms. Lexis of the DA's office trying to get an offer, a global offer on the table . . . Ms. Lexis has assured me she's going to make an offer. She's cautioned it by saying I may not like the offer, but she's going to be getting me an offer for sure." ECF No. 8-10 at 3.

On August 12, 2014, a grand jury indicted Splond in Case No. C-14-300105 for offenses related to the Cricket Wireless and Metro PCS incidents. ECF No. 8-14. The next day, in Splond's presence, Kocka informed the state court: "And at this point, I spoke to Ms. Lexis, there is an offer outstanding that—although their offer is not really all that great." ECF Nos. 8-1 at 14; 8-15 at 3.

In September, Kocka informed the state court about the new indictment and that counsel had "not received an offer" for either of Splond's cases. ECF No. 8-18 at 3–4. A week later, and in Splond's presence, Lexis informed the state court: "I did convey an offer, Your Honor, previously which involved both cases while the second case was still in Justice Court. I can reconvey that offer. Although I know Mr. Kocka did not like it very much, so." ECF Nos. 8-1 at 16; 8-19 at 4. Kocka replied, "Ms. Trippiedi has the other case, Judge. Maybe I'll talk to her and see if I can get a better deal," and "I'm trying to see if Ms. Lexis might somehow soften up." *Id.*

In April of 2015, in Splond's presence, Kocka informed the state court; "Judge, I have been trying to get the DA handling this case, Ms. Botelho to get us an offer. I spoke with Ms. Trippiedi last time, Hagar, she was supposed to get with Ms.—I guess she's Ms. Lexis now, and I can't get either DA to give me an offer on the case whatsoever." ECF Nos. 8-1 at 20; 8-27 at 3.

He further explained, "I am more than happy to stay on this case and get it negotiated if they give me an offer," and explained that if they did not give him an offer, he will have to withdraw as counsel. *Id.* at 3–4.

On April 20, 2015, in Splond's presence, Kocka stated, "I did receive an offer on the case; the offer is not acceptable to my client. So at this point, Your Honor, I don't know if you want me to do it formally in writing or you'll accept it orally, but I'm going to have to get him over to the PD's office because he wants to go to trial." ECF Nos. 8-1 at 21; 8-28 at 3. The state court permitted Kocka to withdraw as counsel. *Id.* At a later hearing, Augustus T. Claus was appointed to represent Splond. ECF Nos. 8-1 at 22; 8-29 at 3.

In March 2016, Claus informed the state court: "Your Honor, just for the sake of the record, I don't believe there was ever an offer extended . . . to me as counsel . . .." ECF No. 8-45 at 7. The prosecutor responded that an offer was made to Kocka: "It was to plead guilty to two robberies with use of a deadly weapon, full right to argue including for consecutive time." *Id.* The court asked Splond if he received that offer, and Splond replied, "No." *Id.* The prosecutor interjected that the offer was revoked while Kocka was counsel and there was no current offer. *Id.* at 7–8. The court addressed Splond stating: "So, sir, if you never got that offer from your other attorney, I apologize. They are telling me now it is withdrawn. So at this point they are not making an offer of any sort it sounds like to you. So I guess we'll just go ahead and proceed and then deal with whatever issues there may be later if there are any." *Id.* at 9. The state court reviewed the minutes from earlier hearings and confirmed an offer was made to Kocka for both cases and before consolidation, but Kocka did not like the offer, and the offer was revoked. *Id.* at 9–10. Claus stated he would request the hearing transcripts, "based upon the answer that was given by Mr. Splond." *Id.* at 53.

### 3. Post-Conviction Evidentiary Hearing

At the state post-conviction evidentiary hearing, Kocka testified that Splond was charged with only one case when Kocka was retained to see if he could resolve it.[3] ECF No. 10-34 at 8. Kocka recalled the second case was coming up the case system and the prosecutors wished to negotiate Splond's cases separately, which Kocka believed was "not a good negotiation for the benefit of my client." *Id.* at 9–10. Kocka testified that he recalled that he received an offer that was not acceptable to Splond but did not recall the terms of the offer. *Id.* at 10–11.

Kocka could not recall whether he did or did not have a conversation with Splond about a plea offer, but said it was his "general practice" when he received an offer to "discuss it with my client and if I feel that it's not a good offer as here trying to negotiate the cases separately, I will recommend to my client they not accept the offer until we can try and get something better." *Id.* Kocka testified, "If I go on the record and say that my client does not feel that it's a good deal, that would in and of itself meant [sic] that the client was aware of it and he has rejected it." *Id.* at 12, 15.

Kocka noted that he informed the state court the case needed to go to the Public Defender because the offer was unacceptable to Splond and Splond wanted to go to trial. *Id.* at 18. Kocka agreed he would only relay that to the court if he had a conversation with Splond who said he wanted to go to trial. *Id.* Kocka stated his remarks indicated he gave Splond the offer, and Splond chose to reject it and to go to trial. *Id.*

Splond testified that his girlfriend, Lisa Wallis, hired Kocka. *Id.* at 20. Splond testified he "never heard any offer" and "he never told me about an offer." *Id.* at 21, 28. He testified that

[3] Kocka testified he was testifying from memory and the Register of Actions in the case because he no longer had his original file as it was relinquished when he withdrew as Splond's counsel. ECF No. 10-34 at 8–9.

on April 20, 2015, "the only thing" Kocka asked him was "do you still want to go to trial?" *Id.* Splond claimed Kocka "never, ever" told him "anything about a deal at any time." *Id.* at 22, 29. When asked why he did not speak up about it when he was in court, Splond explained that he was ignorant and did not know he could or should say anything. *Id.* at 22–23.

Splond testified he "probably" would have taken a deal, but Kocka never told him "any number or anything about a deal." *Id.* at 24. When asked if he would have taken the deal offered, i.e., two counts of robbery with the use of a deadly weapon, full right to argue, including for consecutive time, Splond replied, "There was no numbers behind it. What was even—like a 5 to 15, 6 to—so therefore, I can't answer that." *Id.* at 25. When it was explained that "in a right to argue situation, you aren't guaranteed any time," rather, "[t]he State could argue for the maximum" of "60 years on the top, 24 years on the bottom" and his attorney could argue for a smaller amount of prison, but it would be up to the court to decide the sentence, Splond replied, "It was made to me and negotiated to something else, I—like I said, I don't know because, I, you can't, it wasn't explained to me like that . . .." *Id.* at 25–26. When asked whether he thought he had an alternative to trial when Kocka asked if he still wanted to go to trial, Splond replied, "No. I didn't—I didn't think anything else but that." *Id.* at 29. Splond testified that if counsel had explained the offer to him, there is a likelihood he would have accepted the offer instead of going to trial. *Id.* at 30. He explained that "whatever deal that was on the table was going to relieve [him] in some ways, some shape, some form," so he would have taken a reasonable deal if one was presented to him. *Id.* at 32–33.

Kathy Wallis testified she hired Kocka to represent Splond and that Kocka told her "it would be a fairly simple case due to the fact that he had no prior charges and that, I mean, this

was the first time he's never [sic] been in trouble."[4] *Id.* at 35–36. She said she telephoned Kocka about the status of the case and he would always tell her, "Oh, I'm trying to work a deal or get a deal." *Id.* She testified that he never told her he got a deal; he was always trying to get one. *Id.*

**4. State Court's Determination**

The Nevada Court of Appeals held there was substantial evidence to support the state district court's determination that Splond failed to demonstrate counsel did not present the plea offer to him:

> Splond claims the district court erred by denying his claims that counsel were ineffective. To demonstrate ineffective assistance of trial counsel, a petitioner must show counsel's performance was deficient in that it fell below an objective standard of reasonableness and prejudice resulted in that there was a reasonable probability of a different outcome absent counsel's errors. *Strickland*, 466 U.S. at 687–88; *Warden v. Lyons,* 100 Nev. 430, 432–33, 683 P.2d 504, 505 (1984) (adopting the test in *Strickland*).
>
> . . . .
>
> Both components of the inquiry—deficiency and prejudice—must be shown. *Strickland*, 466 U.S. at 687. We give deference to the district court's factual findings if supported by substantial evidence and not clearly erroneous but review the court's application of the law to those facts de novo. *Lader v. Warden,* 121 Nev. 682, 686, 120 P.3d 1164, 1166 (2005).
>
> [S]plond claimed trial counsel was ineffective for failing to timely convey a plea offer from the State. "[D]efense counsel has a duty to communicate formal offers from the prosecution." *Missouri v. Frye*, 566 U.S. 134, 145 (2012). To demonstrate prejudice, a petitioner "must demonstrate a reasonable probability [he] would have accepted the earlier plea offer," the State would not have canceled the offer, and the district court would not have refused to accept the plea. *Id.* at 147. Further, a petitioner must demonstrate a "reasonable probability that the end result of the criminal proceedings would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time." *Id.*
>
> After holding an evidentiary hearing, the district court found that Splond failed to demonstrate counsel did not present the offer to him. Counsel testified that while he could not remember specifically conveying the offer, his practice

---

[4] At sentencing, there was discussion whether Splond's criminal history belonged to his relatives. *See* ECF Nos. 9-7 to 9-17 at 4, 9–10. However, the State argued at sentencing that Splond was awaiting sentencing on another case at the time of the instant robbery spree. *Id.* at 4.

> was to relay all offers to his clients and to discuss the offer and whether they should accept the deal or not. Further, at a hearing on April 20, 2015, counsel stated, "I did receive an offer. That offer was not acceptable to my client," which the district court found supported counsel's statement that he would have presented the offer. The district court found counsel to be credible and Splond to be incredible. Substantial evidence in the record supports the decision of the district court. Therefore, we conclude the district court did not err by denying this claim.
>
> > [FN 1] Splond argues on appeal that even if counsel did convey the offer to him, counsel did not effectively explain the offer to him. Splond raised this claim for the first time at the evidentiary hearing, and it was not properly before the district court. *See Barnhart v. State,* 122 Nev. 301, 303–04, 130 P.3d 650, 651–52 (2006). We therefore decline to consider this argument on appeal. *See McNelton v. State,* 115 Nev. 396, 415–16, 990 P.2d 1263, 1275–76 (1999).

ECF No. 10-50 at 2–4.

**5. Deferential Review of Ground 2(A)[5]**

The Nevada Court of Appeals's determination is supported by the record. The record shows that Splond was present in the courtroom when his counsel informed the state court that an offer had been made, the offer was not acceptable to Splond, and counsel must therefore withdraw because Splond wished to go to trial. Counsel testified it was his practice to relay all offers to his clients, and to discuss the offers and whether his clients should accept the deal or not. Counsel confirmed, if he states "on the record" that his client does not feel an offer is a good one, that means his client was made aware of the offer and rejected it. Under the circumstances, the Nevada Court of Appeals's determination that Splond failed to show counsel did not inform him about the plea offers is objectively reasonable.

---

[5] The Court notes Splond did not raise in his counseled First Amended Petition a claim that his trial counsel was ineffective for failing to explain to him the State's plea offer. ECF Nos. 15 at 3–5; 15-1 at 5–6.

Ground 2(A) is denied because the Nevada Court of Appeals's determination is neither contrary to, nor constitutes an unreasonable application of clearly established federal law, as determined by the Supreme Court, and is not based on an unreasonable determination of fact considering the evidence presented during the state court proceedings. *See* 28 U.S.C. § 2254(d).

**D. Ground 3(A)—Failure to Oppose Motion to Consolidate**

Splond alleges trial counsel provided ineffective assistance in violation of the Sixth Amendment by failing to oppose the State's Motion to Consolidate. ECF No. 15 at 6. Respondents contend Splond fails to satisfy his burden to show the Nevada Court of Appeals unreasonably applied clearly established federal law or that the decision was based on an unreasonable determination of the facts. ECF No. 37 at 13–14.

On March 3, 2015, the State moved to consolidate Splond's two cases for trial on the grounds that the charges in each indictment are factually connected and evidence of a common scheme or plan. ECF No. 8-21 at 4. At the hearing on the motion, Kocka stated, "I have no opposition." ECF No. 8-23 at 4. Kocka also stated, "We're either going to resolve this or I'll be filing motions, Judge." *Id.* at 5. The motion to consolidate was granted. ECF No. 8-24.

The Nevada Court of Appeals, applying *Strickland*, determined counsel's performance was not deficient because opposition to the motion was futile:

> [S]plond claimed trial counsel was ineffective for failing to oppose the State's motion to consolidate two cases into one case. NRS 173.115(1)(b) provides that joinder of offenses is proper when the offenses are based on "two or more acts or transactions connected together or constituting parts of a common scheme or plan." Offenses are considered connected together when "evidence of either crime would be admissible in a separate trial regarding the other crime." *Rimer v. State,* 131 Nev. 307, 321, 351 P.3d 697, 708 (2015) (internal quotation marks omitted). "[T]he district court must still consider whether the evidence of either charge would be admissible for a relevant, nonpropensity purpose in a separate trial for the other charge." *Id.* at 322, 351 P.3d at 708–09. In addition, "the term common plan describes crimes that are related to one another for the purpose of accomplishing a particular goal," and "the term common scheme

> describes crimes that share features idiosyncratic in character." *Farmer v. State,* 133 Nev. 693, 698, 405 P.3d 114, 120 (2017) (internal quotation marks omitted).
>
> Here, the district court concluded that the three criminal actions were properly joined together because they were connected together or were parts of a common scheme or plan. The acts were committed all within 13 days of each other, and each of the robberies was committed in a similar manner. In each robbery, Splond entered the store, he waited until he and the clerk were the only people in the store, and he asked the clerk to get him something from behind the counter near the cash register. Splond then pulled out a firearm, pointed it at the clerk, and demanded the money in the cash register. Further, the district court found that the crimes were cross-admissible to prove intent. Thus, the district court concluded that Splond failed to demonstrate counsel was deficient because counsel is not deficient for failing to file a futile motion. *See Donovan v. State,* 94 Nev. 671, 675, 584 P.2d 708, 711 (1978). Substantial evidence supports the decision of the district court, and we conclude the district court did not err by denying this claim.

ECF No. 10-50 at 4–5.

The record confirms the crimes occurred over the course of 12 days. ECF Nos. 9-1 at 27, 46, 58; 9-3 at 42. The victims each testified they were alone in the stores with Splond when he robbed them at gunpoint. ECF Nos. 9-1 at 28, 41, 59; 9-3 at 55. At Splond's request, Echevarria obtained keys to unlock holsters to obtain a battery at the front of the store and returned to the cash register to ring up the sale. ECF No. 9-1 at 28. Angles retrieved a cellphone from the back of the store, unpacked it, made it operational, and asked if Splond was going to pay using cash or debit. ECF No. 9-3 at 46, 55–56. Slather obtained cigarettes from behind her and started to ring them up on the cash register. ECF No. 9-1 at 59. When the victims rang up the item(s), Splond pointed a firearm at them and demanded all the money in the register. Thus, the Nevada Court of Appeals's application of *Strickland* is not based on an unreasonable determination of the facts considering the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d)(2).

Because the Nevada Court of Appeals did not rely upon an unreasonable determination of fact, and the issue of whether a motion to consolidate offenses for trial requires an interpretation

of state law, this Court defers to the state court's determination that opposition to the motion to consolidate the offenses for trial was futile. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.") (citing *Estelle v. McGuire,* 502 U.S. 62, 67–68 (1991); *Mullaney v. Wilbur,* 421 U.S. 684, 691 (1975)). Correspondingly, the Nevada Court of Appeals made an objectively reasonable determination that counsel's failure to oppose the motion to consolidate the offenses for trial did not constitute deficient performance under *Strickland*. *See Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005) (holding trial counsel cannot have been ineffective for failing to raise meritless objection).

Ground 3(A) is denied because the Nevada Court of Appeals's determination is neither contrary to, nor constitutes an unreasonable application of clearly established federal law as determined by the Supreme Court and is not based on an unreasonable determination of the facts considering the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).

**E. Ground 3(B)—Failure to Present Eyewitness-Identification Expert**

Splond alleges trial counsel provided ineffective assistance in violation of the Sixth Amendment by failing to present expert testimony regarding eyewitness identification evidence. ECF No. 15 at 6. Respondents contend Splond fails to satisfy his burden to show the Nevada Court of Appeals unreasonably applied clearly established federal law or that the decision was based on an unreasonable determination of the facts. ECF No. 37 at 15–16.

**1. Additional Background**

During Splond's trial, surveillance videos depicting the robbery and the robber were introduced into evidence and played for the jury. ECF Nos. 9-1 at 33–38, 66–72; 9-3 at 51–57.

**a. Identification for Cricket Wireless**

Echeverria, described Splond to the police as having "a lot of acne on his face." ECF No. 9-1 at 27–28, 42. Echeverria said Splond was in the store for about 20 minutes while Echeverria helped a customer and said he "clearly saw him." *Id.* A month after the robbery, Kavon read instructions to Echeverria that accompanied a photographic lineup array. *Id.* at 30–31. The instructions, which were read to the jury at trial, stated:

> In a moment, I'm going to show you a group of photographs. This group of photographs may or may not contain a picture of the person who committed the crime now being investigated. The fact that the photos are being shown to you should not cause you to believe or guess that a guilty person has been caught.
>
> You do not have to identify anyone. It is just as important to free innocent persons from suspicion as it is to identify those that are guilty. Please keep in mind that hair styles, beards, mustaches, are easily changed. Also, photographs do not always depict the true complexion of a person. It may be lighter or darker than shown in the photo.
>
> You should pay no attention to any markings or numbers that may appear on the photos. Also pay no attention to whether the photos are in color or black and white or any other differences in the type or the style of the photographs.
>
> You should only study the person shown in each photograph. Please do not talk to anyone, other than police officers while viewing the photos. You must make up your own mind and not be influenced by any other witnesses, if any.
>
> When you've completed viewing the photos, please tell me whether or not you can make an identification. If you can, tell me in your own words how sure you are of your identification. Please do not indicate to any other witnesses that you have or have not made an identification. Thank you.

ECF Nos. 9-1 at 30–31; 9-3 at 152–54. Echeverria testified that he circled Splond's photograph, signed below the photograph, and wrote: "I took a look at the pictures. The number 2 fit the description on the photo. I'm 100 percent sure that that was the man that came in that night and robbed me at gunpoint." ECF Nos. 9-1 at 30–31, 38–39; 9-3 at 154–55.

At trial about two years later, Echeverria identified himself and the robber in a video of the robbery that was shown to the jury, but Echeverria did not make an in-court identification of Splond. ECF No. 9-1 at 33–38. On cross-examination, Echeverria admitted he was farsighted, needed corrective lenses, and did not wear them the day of the robbery, but nonetheless claimed he had a good look at the robber far away and close up and could "see pretty good." *Id.* at 44.

Williams testified that on the day of the Cricket Store robbery, she saw an African American man leave the store. *Id.* at 46–50, 56. She said he had scars on his face (although she would not describe them as acne scars) and wore a hat. *Id.* She said she saw the man jump into the backseat of a silver vehicle that was driven by an African American female. *Id.* Williams did not recall seeing a photographic lineup array but agreed that she signed the array shown to her at trial. *Id.* at 48–51. Looking at the array in court at trial, Williams claimed the second man depicted in the array "looks like it may be" as he "had a scar on his face," but she was "not sure." *Id.* On cross-examination, Williams admitted she told the detective, "I looked and [sic] the photos and did not recognize any of the people." *Id.* at 51–53. She also admitted that she did not tell the detective that one of the photographs looked closer than the others; rather, she made that statement for the first time at trial, and her memory was not better at trial. *Id.* She was unable to identify the driver of the silver vehicle in a photographic array of female suspects. *Id.*

**b. Identification for Metro PCS**

Angles testified that she had several facial interactions with Splond on the day of the robbery of the Metro PCS store. ECF No. 9-3 at 47–51. She identified Splond in court at trial. *Id.* She testified that, about a month after the robbery, the police read her instructions and showed her a photographic lineup array. *Id.* She testified that she circled "number 2," wrote her name under it, and wrote "I identified the number 2. I'm 100 percent sure that he robbed me at

Smoke Ranch. Nothing is change. [sic] It's still—it's still the same. Only the difference is that he's not wearing a hat." *Id.* at 47–50, 155–56. Angles identified herself and the robber in surveillance video. *Id.* at 52–57.

**c. Identification for Star Mart**

Slathar recognized Splond when he came into Star Mart because he had been in the store before as a customer. ECF No. 9-1 at 66. At trial, Slather identified herself and the robber in video and photographic stills taken from the video of the robbery. *Id.* at 64–72. She also identified Splond in court as the robber. *Id.* at 68.

Las Vegas Metropolitan Police Department (Metro) Officer Joshua Rowberry was called to the Star Mart robbery at about 2:57 a.m. ECF No. 9-3 at 6–11. He was informed the suspect left the store travelling Northbound on Rainbow, so when Rowberry arrived at the scene at about 3:00 a.m., he proceeded Northbound on Rainbow and looked for the suspect in that area. *Id.* Although he was informed the robber left on foot, Rowberry's training and experience informed him that a getaway driver may be parked away from the robbery scene. *Id.* at 12–13. He spotted a lone silver vehicle with tinted windows and collision damage. *Id.* at 12–14, 16. He stopped it and asked the female driver to roll down the back windows. *Id.* at 14–18. When she rolled down the windows, Rowberry saw Splond lying on the back seat, covered in a blanket. *Id.* at 18–19, 31. Rowberry had been informed the robber took a pack of Wrigley's Spearmint gum and two packs of Newport cigarettes, which he saw in the driver's seat of the vehicle. *Id.* at 22–25, 29, 33. Rowberry also found a black hooded sweatshirt on the floor of the backseat, which matched the description given of the robber's clothes. *Id.* Inside the pocket of the sweatshirt, he found a handgun, which was later found to have been stolen. *Id.* at 26–29. Rowberry identified black lint

from the black sweatshirt on Splond's red shirt, indicating Splond took off the sweatshirt. *Id.* at 31–32.

Meanwhile, Metro officer Jeremy Landers arrived at Star Mart at 3:11 a.m., met with Slather, and was informed Rowberry had detained a suspect. *Id.* at 35–37. Landers read Show Up Witness Instructions to Slather and took her to see the suspect. *Id.* at 37–39. The instructions, as read to Slather and the jury, stated:

> In a moment I'm going to show you a person who is being detained. This person may or may not be a person who committed the crime now being investigated. The fact that this person is detained should not cause you to—to believe or guess that he or she is guilty. You do not have to identify anyone. It is just as important to free innocent persons from suspicion as it is to identify those who are guilty.
>
> Please keep in mind clothing can be easily changed. Please do not talk to anyone, other than the police officers, while viewing this person. You must make up your own mind and not be influenced by other witnesses, if any.
>
> When you have viewed the person, please tell me whether or not you can make identification. If you can, tell me in your own words how sure you are of the identification. Please do not indicate in any way to other witnesses that you have or have not made an identification. Thank you.

*Id.* at 73–74.

Landers testified that Slather "made a very rapid identification. And as soon as she saw him, that—that was the guy." *Id.* at 39–40. Slather testified she "instantly" identified the suspect and was "100 percent" certain he was the robber. ECF No. 9-1 at 62–63, 74. She testified that her identification statement read: "The male in front of the police car was the man who robbed me . . . at gunpoint. He was wearing blue jeans, red T-shirt, and black tennis shoes. When he came in the store he was wearing blue jeans, a black hooded sweatshirt and a beanie light/dark spots." *Id.*

On cross-examination, Slather stated she was given the show-up instructions at Star Mart and identified Splond at the show up about 24 minutes later. *Id.* at 75. She stated that when she saw the suspect, she told the police he "had changed his clothes," because he wore a black sweatshirt for the robbery but a red T-shirt at the show up. *Id.* at 75–78. She agreed he looked different in court at trial because he did not wear glasses for the robbery and his goatee was more pronounced in court. *Id.*

**d. Cross-examination Regarding Lineup Arrays**

Defense counsel cross-examined Metro Detective Scott Kavon about his preparation of the photographic lineup arrays that were shown to Echevarria and Angles. ECF No. 9-3 at 157–65. Kavon admitted he was familiar with a "double-blind" process but did not use it. *Id.* at 159–60, 169. He agreed with defense counsel that it seems fair that one of the purposes of a double-blind survey is to keep the person who's giving the survey from inadvertently signaling the person who's taking the survey to what sort of answer they want them to give. *Id.* Kavon agreed that, when he presented the arrays to Echeverria and Angles, he knew Splond was the suspect and that Splond's photograph was in the number 2 position in the array. *Id.* at 170. He also testified that it is rare for an eyewitness to state they are 100 percent certain about their identification. *Id.* at 154.

**e. Jury Instructions and Closing Argument**

The jury was instructed regarding its assessment of witnesses: "The credibility or believability of a witness should be determined by his manner upon the stand, his relationship to the parties, his fears, motives, interests or feelings, his opportunity to have observed the matter to which he testified, the reasonableness of his statements and the strength or weakness of his recollections." ECF No. 9-4 at 11. The jury was also instructed on the presumption of

innocence. *Id.* at 12. And the jury was instructed it could rely upon its common sense and experience in assessing the evidence:

> Although you are to consider only the evidence in the case in reaching a verdict, you must bring to the consideration of the evidence your everyday common sense and judgment as reasonable men and women.
>
> Thus, you are not limited solely to what you see and hear as the witnesses testify. You may draw reasonable inferences from the evidence which you feel are justified in the light of common experience, keeping in mind such inferences should not be based on speculation or guess.

*Id.* at 30.

In closing argument, the prosecutor argued that, although Echeverria did not identify Splond in court, he identified Splond with 100 percent certainty in the photographic array, based on what Splond looked like at the time of the robbery. ECF No. 9-3 at 191–92. The State argued it was not surprising Echeverria could not identify Splond in court because Splond had changed his appearance. *Id.* The State argued Angles stared at the robber's face during the robbery and made a 100 percent certain identification. *Id.* And the State argued that the police caught Splond red-handed with the co-conspirator and the gum and cigarettes along with lint on his shirt from the sweatshirt he was described as wearing during the Star Mart robbery. *Id.* at 192–94.

Defense counsel argued in closing that the photographic identifications were unreliable because they were not conducted using a double-blind test process and explained: "There are such things as double-blind six-packs. Why? Why? Well, because when someone gives them a six-pack and says, 'Do you recognize any of the people here?' Experience has taught us—and even the detective admitted this, albeit somewhat grudgingly—that experience has taught that there can be influence in those choices." *Id.* at 205. Defense counsel argued Williams's in-court identification of Splond lacked credibility because she did not identify him when she was shown his photograph in a lineup array, which was two years before trial. *Id.* at 209–10. Counsel

argued Williams was likely influenced at some point, even if unintentionally, and that is the reason for a double-blind process. *Id.* at 210–11. Counsel argued there are problems with the eyewitness testimony and the jury should instead insist on relying on scientific evidence, which was nonexistent. *Id.* In rebuttal, the State argued the Star Mart video depicts the robber wearing a red shirt underneath a black hoodie and Splond was found wearing a red shirt. *Id.* at 213.

**2. State Court's Determination**

The Nevada Court of Appeals held Splond failed to demonstrate a reasonable probability of a different outcome had counsel retained an expert regarding eyewitness identification:

> Splond claimed trial counsel was ineffective for failing to present expert testimony. Specifically, Splond claims counsel should have presented an expert on eyewitness identification to challenge the photographic lineups given to two of the victims. The two victims identified Splond in a photographic lineup but were unable to identify him in court. A third victim identified Splond at a show up identification and identified him in court. There was also video surveillance of all three robberies that was presented to the jury. When he was found shortly after the third robbery, Splond had cigarettes and gum that were taken in the third robbery and had clothing that was described by the third victim as being worn by the robber. Given this evidence, Splond failed to demonstrate a reasonable probability of a different outcome had counsel retained an expert regarding eyewitness investigation. Therefore, we conclude the district court did not err by denying this claim.

ECF No. 10-50 at 5.

**3. Deferential Review of Ground 3(B)**

The Nevada Court of Appeals's determination that Splond failed to establish prejudice under *Strickland* is objectively reasonable. *See Strickland*, 466 U.S. 694.

The Ninth Circuit has held that "skillful cross examination of eyewitnesses, coupled with appeals to the experience and common sense of jurors, will sufficiently alert jurors to specific conditions that render a particular eyewitness identification unreliable." *Howard v. Clark*, 608 F.3d 563, 574 (9th Cir. 2010) (collecting cases). The Ninth Circuit reasoned that, if federal

defendants are not prejudiced by the exclusion of testimony from eyewitness-identification experts, then state defendants are not prejudiced by a trial attorney's failure to call such an expert. *See id.* (noting that was especially true in that case because the jurors were instructed on the potential shortcomings of eyewitness testimony).

Here, video surveillance of the robberies that depicted the robber were presented to the jury. All three victims testified that they previously identified Splond as the robber during either a show-up shortly after the robbery or in photographic line up arrays shown to them a month after the robbery. All three victims were 100 percent certain about their identifications at the time they made them. At trial, one victim (Echeverria) and one witness (Williams) were unable to identify Splond in court. Defense counsel cross-examined the eyewitnesses concerning factors affecting their ability to identify the robber and cross-examined the police concerning factors that affect the reliability of their identification procedures. The jury was instructed on factors that affect a witness's credibility, including the opportunity to have observed the matter to which he or she testified, and the reasonableness of his or her statements, and the strength or weakness of his or her recollections. The jury was instructed that it could rely upon common sense and experience in its assessment of the evidence. And the jury was instructed on the presumption of innocence. Finally, defense counsel directed the jury to weaknesses in the identifications during closing argument. Thus, it was reasonable to rule there is no reasonable probability the result of the trial would have been different but for trial counsel's failure to call an expert to testify regarding eyewitness identification. *See Strickland*, 466 U.S. at 694; *Howard*, 608 at 574.

Ground 3(B) is denied because the Nevada Court of Appeals's ruling that Splond failed to establish prejudice under *Strickland* was neither contrary to, nor an unreasonable application

of, clearly established federal law, and was not based on an unreasonable determination of the facts considering the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).

**F. Ground 3(C)—Failure to Request Eyewitness Instruction**

Splond alleges trial counsel provided ineffective assistance in violation of the Sixth Amendment by failing to request jury instructions addressing eyewitness identification. ECF No. 15 at 6. Respondents contend Splond fails to satisfy his burden to show the Nevada Court of Appeals unreasonably applied clearly established federal law or that the decision was based on an unreasonable determination of the facts. ECF No. 37 at 16–18.

During trial, the state court asked trial counsel whether he had any additional instructions to offer, and counsel did not suggest eyewitness identification instructions. ECF No. 9-1 at 99–100. The court provided the parties with the final set of instructions and allowed them until the following morning to submit proposed changes. *Id.* at 105–06. The following day, the parties discussed instructions, but counsel did not request instructions about eyewitness identification. ECF No. 9-3 at 3–5, 63, 136–42, 171.

The Nevada Court of Appeals determined that counsel's failure to request specific instructions about eyewitness identification was not deficient performance under *Strickland*:

> [S]plond claimed trial counsel was ineffective for failing to request a jury instruction specifically addressing eyewitness identification. The Nevada Supreme Court has held that "specific eyewitness identification instructions need not be given[ ] and are duplicitous of the general instructions on credibility of witnesses and proof beyond a reasonable doubt." *Nevius v. State,* 101 Nev. 238, 248–49, 699 P.2d 1053, 1060 (1985). Here, the district court gave instructions on the credibility of witnesses and proof beyond a reasonable doubt. Therefore, Splond failed to demonstrate such a request would have been granted, and counsel is not deficient for failing to make futile requests. *See Donovan,* 94 Nev. at 675, 584 P.2d at 711. Accordingly, we conclude the district court did not err by denying this claim.

ECF No. 10-50 at 5–6.

A defendant's right to due process is protected when the jury instructions adequately convey the defendant's theory of the case. *See United States v. Romm*, 455 F.3d 990, 1002 (9th Cir. 2006); *Davis v. State*, 130 Nev. 136, 145 (2014) ("[T]he district court may refuse a jury instruction on the defendant's theory of the case which is substantially covered by other instructions.") (quoting *Runion v. State*, 116 Nev. 1041, 1050 (2000)). The Nevada Supreme Court has held that "specific eyewitness identification instructions need not be given and are duplicitous of the general instructions on credibility of witnesses and proof beyond a reasonable doubt." *Nevius v. State*, 101 Nev. 238, 248–49 (1985).

Splond fails to establish his defense concerning the unreliability of the eyewitness identification testimony depended on an instruction that was not already encompassed within the instructions given to his jury. ECF Nos. 15; 15-1. The jury was instructed on the assessment of the believability and credibility of witnesses, including the opportunity to have observed the matter to which he or she testified, and the reasonableness of his or her statements, and the strength or weakness of his or her recollections. Counsel cross-examined the eyewitnesses about the reliability of their identifications and cross-examined the police about the reliability of the identification procedures. And counsel argued in closing that there were problems with the eyewitness's identifications of Splond. Accordingly, Splond has not demonstrated the Nevada Court of Appeals's determination that counsel was not deficient for failing to request a specific identification instruction is objectively unreasonable. Ground 3(C) is denied because the Nevada Court of Appeals's ruling was neither contrary to, nor an unreasonable application of, *Strickland* or any other Supreme Court precedent, and it was not based on an unreasonable determination of the facts considering the evidence presented during the state court proceedings. *See* 28 U.S.C. § 2254(d).

**Certificate of Appealability**

This is a final order adverse to Splond. Rule 11 of the Rules Governing Section 2254 Cases requires the Court to issue or deny a certificate of appealability (COA). Accordingly, the Court has sua sponte evaluated the claims within the Petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864–65 (9th Cir. 2002).

Under 28 U.S.C. § 2253(c)(2), a COA may issue only when a petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983), *superseded by statute as stated in Slack*, 529 U.S. 473). Applying these standards, a COA will issue for Ground 2(A).

**Conclusion**[6]

It is therefore Ordered that the First Amended Petition (ECF No. 15) is denied on the merits.

It is further ordered that a Certificate of Appealability is granted for Ground 2(A) of the First Amended Petition, and a Certificate of Appealability is denied for all other Grounds.

It is further Ordered that the Clerk of Court is kindly directed to substitute Ronald E. Oliver for respondent Gabriela Najera, enter judgment accordingly, and close this case.

Dated: September 29, 2026

GLORIA M. NAVARRO
UNITED STATES DISTRICT JUDGE

[6] The Court notes the parties made arguments and cited cases that are not discussed above. The Court has reviewed those arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the issues before the Court.